IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Criminal Case No. 04–cr–00444–EWN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

JEREMY JAY BARGER,

     Defendant.

_____

## ORDER AND MEMORANDUM OF DECISION
_____

Defendant Jeremy Jay Barger is charged with knowingly and intentionally possessing with

the intent to distribute at least 50 grams of methamphetamine in violation of 21 U.S.C.A. § 841

(2006 West), and possessing a firearm in furtherance of a drug trafficking crime in violation of 18

U.S.C.A. § 924 (2006 West). This matter is before the court on Defendant's "Motion to

Suppress Evidence and Statements, and for Return of Property." The court held an evidentiary

held a hearing on this motion and now enters the following findings and conclusions.

## BACKGROUND

### *1.     Factual Background*

In late November 2003, someone broke into a Fort Collins Police Department police car

parked at a police officer's house, and stole, *inter alia*, a shotgun, radar detector, flashlight, and

Minolta camera from the vehicle. On December 2, 2003, someone broke into a Larimer County

Sheriff police car parked at a deputy sheriff's house and stole similar items.[1]  On the next day,

Colorado State Patrol and Larimer County Sheriff's office arrested Andrew Wisniewski, who had

a backpack containing several of the items that had been stolen from the two police vehicles.

After initially providing Larimer County Sheriff deputies with a false story, Wisniewski confessed

to the Larimer County Sheriff deputies and Fort Collins Police Detective Art Choury that he

broke into the two vehicles and stole the various items that the officers reported missing.

Wisniewski's explanation of what he stole matched the items the two police organizations were

missing from the two break-ins.

Wisniewski stated that he gave several of the stolen items to Defendant to pay off a drug

debt.  These items included a police shotgun.  Wisniewski stated that Defendant dealt drugs out of

his residence on a daily basis, had installed video surveillance cameras outside of his residence to

monitor any traffic approaching his house, and was always armed.  Wisniewski described the

general location of Defendant's house to Choury, hand drew a map of Defendant's house, and

then accompanied Choury as they drove to Defendant's house in Weld County, so Wisniewski

could personally identify the house.

After Wisniewski identified the house, with the approval of the Larimer County District

Attorney's office, Choury obtained a no-knock search warrant for Defendant's house, signed by

Larimer County District Court Judge Terry Gilmore.  The search warrant identifies the following

items that the police could search for:

---

[1]Fort Collins is the biggest city in Larimer County.  Greeley, discussed below, is the
biggest city in Weld County, which is adjacent to Larimer County.

1.  Wilso Rogers .45 cal. 7 round Magazine loaded with .45 cal. Ammo.
2.  Larimer County Sheriff's Deputy Badge in black leather bi-fold wallet.
3.  Remington model H70 pump shotgun serial # D064207M.
4.  Vindicator police radar gun, serial # 3365.
5.  Black Streamlight flashlight w/ charger.
6.  Gray AR15 rifle magazine loaded with .223 cal. Ammo.
7.  2 pair silver handcuffs in black handcuff case.
8.  Any documents pertaining to rental or ownership of any storage units.
9.  Any controlled substances that is [sic] illegal pursuant to Colorado Revised Statutes.
10. Letters, papers, clothing, shoes and boots, personal effects, and all items of evidence which serve to identify the person or persons at and in control of the premises searched and will be material evidence in a subsequent criminal prosecution.

SWAT teams from the Fort Collins Police Department and the Greeley Police Department met in the early morning hours of December 4, 2003 at the Greeley Police Department's Firearm Range to prepare to execute the search warrant.  Present at the meeting was Bruce Martin, a division commander for the Weld County Sheriff, whom the Fort Collins Police Department had notified of the search because Defendant's residence was in Weld County.  Sergeant Dan Murphy of the Fort Collins Police Department led the procession from the firing range to the area where the two SWAT teams prepared for their raid.

According to various witnesses, it was a cold and windy morning.  Around seven o'clock in the morning on December 4, 2003, the SWAT teams descended on Defendant's house.  The Fort Collins SWAT team entered Defendant's residence, while the Greeley SWAT team protected the perimeter of the residence.  During the raid, Martin remained in his police vehicle at the "command post," one hundred yards from Defendant's house.

The Fort Collins Police entered the premises, and initially located Defendant, Hugh McGraw, and David Taylor.  Defendant, at the time, was wearing jeans, a flannel undershirt, and a T-shirt, and was barefoot.  Some of the Fort Collins police officers hand-cuffed these three individuals and brought them outside of the residence, while other officers continued their sweep of the house.  The officers located three more individuals in the house, whom they detained in the living room.  Once the police officers were confident that they had secured the house, they brought Defendant, McGraw, and Taylor back inside.  According to the testimony of several of the officers on scene, Defendant, McGraw, and Taylor were outside for five to ten minutes before the police officers brought them back inside.  According to Defendant, the officers detained them outside for thirty to forty minutes before the officers brought them back inside.  Defendant further testified that he was very cold while outside, and when he asked for shoes and a jacket, the officers who were detaining him just pushed a gun into his chest in response.

Around the same time, an unidentified Greeley SWAT officer detained Ray Shultz, a farm hand who managed the feed lot on the land surrounding Defendant's house.  Shultz, at the time, had been feeding cattle from his truck.  The Greeley SWAT officer kept Shultz out of the truck, in the cold, at gun point for thirty minutes to an hour.  Later that morning, a Fort Collins officer apologized to Shultz for the detention.

During the sweep of the house, the officer's found in Defendant's backpack, *inter alia*, a firearm, six ounces of methamphetamine, and a small quantity of marijuana.  The officers saw numerous drug paraphernalia in the house.  They also found numerous laboratory glass beakers in

a tote upstairs in the house.  The same tote also included a book about how to make

methamphetamine and ecstasy.  The residence also had one video surveillance camera.

Once all six residents of the house were together in the living room, Choury pulled

Defendant into a side room and asked him if he knew why the police were there.  According to

Choury's testimony, and Defendant's testimony on cross-examination, this was the only question

Choury asked Defendant prior to Choury reading Defendant his *Miranda* rights, and receiving a

waiver from Defendant of these rights.  Defendant made no incriminating statements prior to

Choury reading Defendant his *Miranda* rights.  Defendant, according to this evidence, testified on

direct examination, however, that Choury asked him several questions before reading him his

*Miranda* rights.  During this time, Defendant was sober and uninjured, but he had cold feet from

being outside.

Defendant told Choury that the police firearms might be in his storage locker, and gave

Choury permission to search this storage locker.  Choury found the stolen police shotgun in the

storage locker.  While Choury was searching the storage locker, Defendant told Jeffrey Bruce, a

detective with the Fort Collins Police Department, that he had a few ounces of methamphetamine

in the house.

Meanwhile, while patrolling the outside of the house, Investigator Michael Moran of the

Greeley Police Department noticed a yellow John Deere skid loader.  Moran knew that there had

been a report of a stolen yellow John Deere skid loader.  Moran looked for a serial number on the

skid loader, which he could see from outside the skid loader by looking into the open cabin of the

skid loader.  He saw that the serial number was scratched out.  He then briefly talked to

Defendant who said he thought the skid loader might be stolen.  Moran therefore seized the skid

loader.  Moran later learned that this was the skid loader that was reported stolen.

The officers seized numerous other items.  Moran and William Hood, a Weld County

Deputy Sheriff, seized a welder that Defendant said he bought from Graham Loines for $1500.

Previous to December 4, 2003, Moran had been investigating Loines for multiple thefts.  The

serial number on the welder had been removed.  The officers also seized the computers in the

house, some of which were claimed by a resident at Defendant's house, Janet Ramseier.  Ramseier

said she got the computers from Loines at a very cheap price.  The officers later returned one of

the computers to Ramseier.  At the time, no one claimed to own the other computers.  According

to Defendant's testimony at the suppression hearing, he owned the other computers and had

purchased them from a friend.  The officers on the site also seized a trailer on the property that

did not have serial numbers on it.  Defendant told the officer that the trailer belonged to his

mother, but he did not produce registration or title.  After speaking a few months later with

Defendant's mother, who had the registration for the trailer, Hood returned the trailer to

Defendant's mother.  The officers did not seize many of Defendant's possessions at this residence,

such as Defendant's tools, his motorcycle, and his go-carts.

Weld County Deputy Sheriff Josh Noonan arrived on the scene around eleven o'clock that

morning, and preceded to question Defendant.  Defendant told Noonan that he sold

methamphetamine to friends for $900 an ounce and never sold it in quantities smaller than an

ounce.  Defendant claims that he later learned that the police officers took his fiancee's

engagement ring, which was worth $1200, from his house.  Defendant does not have a receipt for this ring.  The ring is not recorded in any police log.

## 2.      *Procedural History*

Defendant was indicted on federal charges on October 21, 2004.  On December 17, 2004, Defendant moved (1) to suppress evidence and statements, and (2) for the return of his property.  (Mot. to Suppress Evidence and Statements, and for the Return of Property [filed Dec. 17, 2004] [hereinafter "Def.'s Br."].)  I held an evidentiary hearing on this motion on February 4, 2005.

## ANALYSIS

## 1.      *Legal Analysis*

Although Defendant raises numerous arguments in his briefs, at the hearing Defendant continued to press only two of his original arguments.  Defendant contends that (1) the Fort Collins police executed the warrant in violation of Colorado law, and (2) the various police departments conducted an overbroad search which requires blanket suppression.  I address each contention in turn.  Then, for the sake of completeness, I briefly address the other contentions that Defendant raised in his brief but did not pursue at the hearing.

### a.      *Colorado Law Violation*

Defendant contends that the Fort Collins police officers violated Colorado law by executing the search warrant in Weld County.  Colorado Revised Statute section 16–3–305 provides that: "[e]xcept as otherwise provided in this section, a search warrant shall be directed to any officer authorized by law to execute it in the county wherein the property is located."  Colo. Rev. Stat. § 16–3–305(1) (2004).  Fort Collins police, acting alone, could not therefore execute

the warrant in Weld County.  The Fort Collins police, however, were not acting alone.  Martin, who was the Division Commander for the Weld County Sheriff, was present at the briefing, led the procession from the firing range to the area where the two SWAT teams prepared for their raid, and remained at the command post during the raid.  In light of this evidence, although the Fort Collins police officers were the ones that entered the house, they did so under the auspices of the Weld County Sheriff's office.  Acting with the approval of the Weld County Sheriff's office, and with a Weld County Sheriff deputy present, the Fort Collins police officers met the requirements of Colorado Revised Statute section 16–3–305.  *Cf. People v. Hamer*, 689 P.2d 1147, 1150 (Colo. App. 1984) (Babcock, J.) (holding that search did not violate the defendant's Fourth Amendment rights when an officer of the proper jurisdiction "was summoned to the premises prior to the commencement of the search [by the police officers who were conducting the search outside of their jurisdiction] and supervised execution of the warrant.").

Assuming, *arguendo*, that the Fort Collins police officers violated Colorado law by executing the search warrant in Weld County, this violation would not mandate suppression.  The exclusionary rule only applies to violations of the United States Constitution.  *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999).  Police officers' "violation of state law is not, without more, necessarily a federal constitutional violation."  *United States v. Mikulski*, 317 F.3d 1228, 1232 (10th Cir. 2003).  Indeed, the Tenth Circuit has specifically held that where police officers conducted a search pursuant to a lawful warrant outside of their jurisdiction in violation of Kansas law, the search did not offend the United States Constitution.  *Green*, 178 F.3d at 1104–06.  Accordingly, the search and seizure did not violate Colorado law, and even if it did

violate Colorado law, the search and seizure does not provide grounds for the suppression of the evidence and statements obtained. Defendant's argument as to this point is therefore without merit.

**b.** *Overbroad Search*

Defendant argues, moreover, that although the search warrant was valid, the search and seizure performed by the officers extended so far beyond the reach of the search warrant as to mandate a blanket suppression of all items seized including those enumerated in the search warrant. A "blanket suppression is mandated when the executing officers flagrantly disregard the particular terms of the warrant." *United States v. Foster*, 100 F.3d 846, 851 (10th Cir. 1996). Blanket suppression is an "extreme remedy," and "should only be imposed in the most 'extraordinary' of cases." *Id.* at 852. Here, many of the items seized by the police officers were specifically enumerated in the search warrant. The following items were identified at the hearing that the police officers seized but were not mentioned in the warrant: (1) the skid loader, (2) the welder, (3) the computers and their printers, (4) the trailer, and (5) three two dollar bills.[2]

Several of these items were properly seized under the plain view doctrine. The plain view doctrine permits a police officer to

> seize evidence of a crime if (1) the officer was lawfully in a position
> from which the object seized was in plain view, (2) the object's

---

[2]During the hearing, Defendant raised the issue of the following items that the police officers seized that Defendant claims an ownership interest in: (1) a Streamlight flashlight, and (2) a Minolta camera. Each of these items, however, were specifically listed in the search warrant. Defendant also assumes that the police officers seized the engagement ring, but the accuracy of this assumption is dubious at best.

> incriminating character was immediately apparent (i.e., there was
> probable cause to believe it was contraband or evidence of a crime),
> and (3) the officer had a lawful right of access to the object.

*United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004). Regarding the skid loader, first, the skid loader was in plain view during the lawful search operation. Moreover, the scratched out serial number was likewise in plain view during the lawful search operation. Second, knowing that there had been a report of a stolen yellow John Deere skid loader and that the serial number on this skid loader was scratched out, Defendant admitted the skid loader might be stolen, and Defendant possessed items that were stolen from police vehicles, Moran had more than enough probable cause to seize the skid loader.[3] Third, Moran had a lawful right of access to the skid loader. Accordingly, Moran acted properly in seizing the skid loader.

Regarding the welder, first, the welder and its lack of a serial number were in plain view during the lawful search operation. Second, knowing that the serial number on the welder had been removed, Defendant said that he bought the welder from a person under investigation for multiple thefts, and Defendant possessed items that were stolen from police vehicles, Moran and Hood had probable cause to seize the welder. Third, there was nothing impeding Moran and Hood's lawful right of access to the welder.

---

[3]Defendant argues, citing *Bigford v. Taylor*, 834 F.2d 1213 (5th Cir. 1988), that the mere fact that serial numbers are missing from an item is not enough to establish probable cause that the item is stolen. Assuming, *arguendo*, that this statement represents the law in the Tenth Circuit, this case is factually distinguishable because the police officers were aware of additional facts that suggested that the skid loader, the welder, and the trailer were stolen.

Regarding the trailer, first, the trailer and its lack of a serial number were in plain view. Second, knowing that the trailer did not have a serial number on it, Defendant did not produce the title or registration of the trailer, and Defendant possessed items that were stolen from police vehicles, the officers had probable cause to seize the trailer. Third, there was nothing impeding the officers' lawful right of access to the trailer. Accordingly, the police officers properly seized the skid loader, the welder, and the trailer.

Thus, the only items identified by Defendant that the various police officers improperly seized were the computers, the printers for the computers, and the three two dollar bills. The seizure of these items is not sufficiently "extraordinary" to justify a blanket suppression of all evidence seized. This was not a case where the police officers seized all items at the residence. The officers did not seize many of the items at the residence after questioning Defendant, such as Defendant's tools, his motorcycle, and his go-carts. Accordingly, a blanket suppression of all evidence is unwarranted.

### c.    Excessive Force

Defendant argued in his motion, but did not maintain the argument at the hearing, that the various police agencies used excessive force. There is some evidence that the Greeley SWAT team used excessive force against Shultz, and I do not condone the Greeley SWAT team's actions towards Shultz. There is no reliable evidence, however, that the Fort Collins SWAT team that dealt with the people and evidence in the interior of the residence used excessive force. I do not believe Defendant's claim that the police officers kept him outside for thirty to forty minutes.

This claim is contradicted by several police officers, and only supported by Defendant's own testimony.[4]

Defendant's testimony, to the extent that it was self-serving and in conflict with other testimony at the suppression hearing, completely lacked credibility.  Many of Defendant's statements during the hearing were simply preposterous.  For example, (1) Defendant claimed that he did not think the police radar gun Wisniewski gave him was stolen; (2) Defendant testified that he had no idea why Wisniewski was giving him the stolen police equipment and that he did not receive this equipment in exchange for a drug debt; (3) Defendant admitted that he sold methamphetamine, but claims that he doesn't know for how much per ounce he sold methamphetamine, even though he told Noonan on December 4, 2003 that he sold it for $900 an ounce; (4) Defendant testified that he purchased the laboratory glass beakers so he could go into business with his mother to sell them on E-Bay, despite the fact that he admitted that he placed a book on how to manufacture methamphetamine in the same tote he kept the beakers in; and (5) Defendant testified that he remembers that there were scratch marks inside the skid loader on the lower right hand side, but did not know that this is where the serial number had been scratched out.  In light of Defendant's demeanor, his self-interest, and the absurd statements cited above, I do not find him to be a credible witness.  I therefore reject his testimony that was self-serving and at odds with the other evidence in this case.

---

[4]Even if I believed Defendant's testimony as to this point, suppression of the evidence would still be inappropriate.

Moreover, the police officers were entering a place that was potentially very dangerous. From Wisniewski's statements, the police suspected that Defendant had stolen police firearms, dealt drugs, was armed at all times, and monitored his residence by video surveillance.  It was not inappropriate for the various police agencies to execute the warrant with large and heavily armed SWAT teams.

### d.       Unreasonable Detention

Defendant argued in his motion, but did not maintain the argument at the hearing, that the police officers should have stopped detaining him once the police officers completed their search. This argument is meritless.  By the time that the police officers finished their search, they had probable cause to arrest Defendant.  Moreover, considering the firearms possessed by Defendant, it would have been dangerous for the police officers to remove Defendant's handcuffs and permit him to go about his business, as Defendant suggests the police officers should have done.

### e.       Probable Cause for the Warrant

Defendant argued in his motion, but did not maintain the argument at the hearing, that the various police agencies did not have probable cause to obtain a warrant.  This argument fails because Wisniewski's confession, which the officers corroborated by the objective evidence of the actual items stolen from the police cars and the location of Defendant's house, provided probable cause for the warrant.  Assuming, *arguendo*, that the police officers did not have probable cause to obtain the warrant, their actions fall within the good faith exception.  "[W]hen police officers act in good faith and reasonable reliance on a search warrant, the evidence obtained during the search should not be suppressed even if the warrant was lacking in probable cause." *United*

*States v. Lora-Solano*, 330 F.3d 1288, 1294–95 (10th Cir. 2003) (quoting *United States v. Price*, 265 F.3d 1097, 1102 [10th Cir. 2001]) (alteration in original).  Here, there is no evidence that "a reasonably well trained officer would have known that the search was illegal despite the [judge]'s authorization."  *United States v. Tisdale*, 248 F.3d 964, 972 (10th Cir. 2001) (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 [1984]).  For these reasons, the search warrant was based upon probable cause, and alternatively, the police officers' search fell within the good faith exception.

### f.      Miranda violations

Defendant suggested in his motion, but did not maintain the argument at the hearing, that the police officers took statements from him prior to reading him the *Miranda* warnings.  Here, the evidence presented at the hearing demonstrates that Defendant made no incriminating statements prior to Choury reading Defendant his *Miranda* rights.  Therefore, there was no violation of *Miranda*.  Also, there is no evidence that Defendant did not voluntarily give his incriminating statements.  The mere fact that Defendant's feet were cold was insufficient to demonstrate that Defendant's statements were not "the product of an essentially free and unconstrained choice."  *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  Accordingly, I will not suppress Defendant's statements.

### g.      Return of Defendant's Possessions

In Defendant's motion to suppress, he additionally requests the return of (1) the computers, (2) the John Deere Skid Loader, (3) the Welder, (4) "[a]ll personal property, including identification, jewelry, vehicles registrations and titles, mail, clothing," (5) "CD-Roms, books,

credit cards, checks, photos and money," (6) "35mm camera and any other camera equipment," and (7) "Streamlight rechargeable flashlight." (Def.'s Br. at 8–9.) I will hold a status conference regarding this issue on the date set forth below. In preparation for this status conference, the parties are to confer in an attempt to resolve the issues regarding the return of Defendant's possessions which he is lawfully entitled to possess.

*2.*     *Conclusions*

Based on the foregoing it is therefore

ORDERED as follows:

1. Defendant's Motion to Suppress (# 22) is DENIED.

2. The court will hold a status conference commencing at 9:45 o'clock a.m. on November 16, 2006 in Courtroom A1001, Alfred A. Arraj United States Courthouse, Denver, Colorado regarding Defendant's motion for return of property. In preparing for this status conference, the parties shall confer in an attempt to resolve the issues regarding the return of Defendant's possessions.

Dated this 27th day of October, 2006.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge